Our next case this afternoon is case number 418-0491, Bishop v. Lebshler, and for the appellant we have Ms. McGrath, and for the appellee we have Mr. Cross. You may proceed, counsel. McGrath Thank you, your honor. Good afternoon, justices. May it please the court, counsel. Your honors, I first want to recognize, as we all do, the difficult decision trial courts face in these relocation cases. They're very emotional. I must assert respectfully to this court, and in all due respect to the trial court, that in this case, if the ruling by the court is not found to be against the manifest way of the evidence, and if relocation is not authorized, the only time a relocation case would be appropriate would be if the objecting parent had no relationship with the child. And I want to go through the factors which, of course, this court and the trial court considered. The first factor being the circumstances and the reasons for the relocation. The trial court in this case did say that was one of the big issues in this case. And the trial court did say that Ms. Bishop's spouse, Mr. Cornell, didn't want to work in Illinois, and that the other job that he found in Colorado was not overwhelmingly better than the job he had been in. That is one of the big issues that I believe, your honors, is against the manifest way of the evidence, the finding by the trial court. When Mr. Cornell was working at Trinity, he was submitted to black soot coming out of his nose every weekend. Even the foreman acknowledged all of that. I got the impression from the comments of the trial court that there was some concern that, well, they had just gone to Colorado, the first time they had ever been to Colorado was 2017, and so they decided they liked Colorado, and so that's where they decided they were going to try to find some place to live. And, your honor, that may have been the case. However, Mr. Cornell and Ms. Bishop testified, Mr. Cornell was not happy in his job since dating back to 2015. He had applied for several other positions in Illinois. They had vacationed elsewhere in Florida. There was testimony and some photographs submitted, but they didn't choose to move to Colorado. Yes, they did go out there on a vacation. Yes, there was extended family that lived there. Ms. Bishop's brother, sister-in-law, a niece, two-year-old niece, and a newborn, soon to be born. So to fault them for finding Colorado and looking at the schools and looking at the other advantages to Colorado, I don't think is unfair to them. The Illinois Supreme Court has said in the past to fault him, first of all, for the judge to indicate, well, he didn't think he wanted to stay in Illinois. The trial judge had also found there was no ill intent by Ms. Bishop. She wasn't trying to interfere with Mr. Lipshear's parenting time. It was a legitimate decision for them to move, but then to fault them because they choose Colorado and because they didn't want to stay in Illinois. Mr. Cornell is a welder. He's not a manager at Target, where he might have been able to find a job in Peoria or somewhere. So he's in a specific field, and he had looked for work in Illinois. He finds this job in Colorado, and he's looking for employment in Illinois. He's looking for employment in Colorado, and he's looking for employment in Illinois. Which is significantly better than his position at Trinity. Do you think the trial court improperly considered the fact that he, I know the trial court commented on the fact that maybe these jobs that he was looking for, that they weren't welding jobs. He talked about, I think, Illinois State and some other jobs that he applied for that weren't welding jobs. And quite frankly, I don't recall the court commenting on that. I recall they had an argument. However, I didn't see that. I don't believe the court was seeing that as a factor. But if we're going to go back to did he sufficiently look for employment in Illinois, which again, I'm not quite sure why the trial court did, but with all due respect, he did apply for some welding positions. He explained in his testimony other positions he had applied for, and the reasons he did not, I'm sorry, he did not apply for, and the reasons he did not, one being that one of the positions was significantly lower paying. The other one included significant travel. So did he perform a sufficient job search in Illinois if we're going to go there? I think he did. And it's your position we really shouldn't have even gone there. Yes, it is, Judge, because the trial court found that there wasn't any ill intent by Ms. Bishop. And so we go to was the job, based on what the judge said, overwhelmingly better. Judge DeArmond has already noted, yes, the supervisor even talked about, I mean, the condition of his position at Trinity was horrendous. The company had lost half of its workforce in 2017, 115 people. So there were legitimate reasons to look to VESTA, and then when you look to VESTA where he got his job in Colorado, he's going to end up with 78 days more off each year. Yes, the hourly rate is 20 cents an hour, less than what he was getting at Trinity, but when you look to the health insurance for his entire family at his new place of employment, it's over $1,900 less than what he was paying at Trinity, and that insurance didn't even include the entire family. Because that insurance at that time only included Mr. Cornell and the party's youngest child, Mavis, did not include Ms. Bishop or Maiden. With regard to opportunities for advancement, it's much greater at VESTA than it was at Trinity. He was already training to become a foreman. The hourly rates there would jump from 24 an hour and then jumping into 27 an hour. They had more 401k match, 6% versus 3% at Trinity. So for all of those reasons, was it a reasonable decision to move to Colorado? Yes, and I think the court's ruling to the contrary was against the manifest way of the evidence. We all know this is a mobile society, and as I indicated, he's a welder. There are limited positions and there shouldn't have been any fault placed on them to make that decision to move to a better state, a better paying job, which would benefit Maiden as well as the entire family. The second factor the court looks to is the reason for the objection. Mr. Lipshear objected because he likes the schedule he had. The schedule Mr. Lipshear has is two weekends a month. So we're talking about from Friday 5 p.m. to Sunday 5 p.m. We're talking about four days in a month. That's his schedule. Two weeks in the summertime, alternating weekends. This has never been enough to dispel or to deny a relocation request because that's just your typical schedule. This isn't a situation where we have joint parenting, joint decision making. The father is involved in day-to-day activities. In fact, this is a situation where Mr. Lipshear did not participate in extracurricular activities with this child or attend those extracurricular activities. Ms. Bishop was found by the trial court also and Mr. Lipshear agreed. Everyone agreed Ms. Bishop was the heart and soul of this child. She was the primary caretaker. She did all the decision making. Ms. Maiden and Mavis are her life and they are with her 24-7. She's a stay-at-home mother. So the reason for the objection would be raised in any relocation case and certainly should not have controlled the court's decision in that regard. Similarly, and I've kind of just covered the history of the relationship of both parties. Now we contend, Mr. Lipshear, I mean we agree. We can see Mr. Lipshear loves Maiden. He's a good father. But again, when you're looking at that factor, I think everyone agreed and the trial court even found that her relationship with Maiden was closer. It was closer because she's 24-7. Mr. Lipshear has parenting time four days out of the month and two weeks in the summer. The court really didn't find anything else to the educational other than to say that the educational experiences in Colorado were not overwhelmingly better. I think everyone agreed the educational experience for Maiden in Colorado was as good as it would have been in Clinton. Mr. Lipshear even testified the educational experience in Colorado, the schools they considered, would have been, they were good. Both sides, both locations have extended family. And even the trial court found that the maternal grandparents and family were closer, somewhat closer to the child, to Maiden, than were Mr. Lipshear's. The trial court found, I guess hypothetically or reasoned, down the road as time goes on, the paternal grandparents would be just as close. But we had clearly maternal grandparents that were closer and extended family that were closer. Now with regard to the impact on the child with this move, the only thing the trial court reasoned, it said, it really didn't know how this move would impact the child. The trial court focused and continued to focus on Mr. Lipshear's interests. The trial court found only that the visitation schedule would change. And the trial court was concerned that if this move occurred, that Mr. Lipshear couldn't participate in school activities, couldn't see the child's pottery, if the child made pottery, etc. Had he participated in the child's school activities before? There had not been school activities yet, Your Honor. However, he had not attended extracurricular activities, both swimming and soccer, that happened regularly with the child that the testimony was that he was aware of. There was no contradictory testimony to that effect. I would also note, Your Honor, that Mr. Lipshear has a seven-year-old child who he had no relationship with that child throughout the first seven years. After this case began and shortly before the trial, consistent with Mr. Lipshear's testimony, he then was initiating a relationship with that child. So clearly, Mr. Lipshear had not participated in school activities or extracurricular activities with that child either. Is that something the court should have considered? Well, Judge, yes, I believe the judge should have considered that fact in determining whether... It's predictive of his future behavior with respect to this child? Yes, Judge, exactly. And I would also note, Your Honor, that Mr. Lipshear didn't testify he was going to miss school events or pottery. That was the trial court that testified as to that concern. The child's impact by denying this relocation is to deny him his right to live with his mother, who everybody said was the heart and soul of he and Madden's stepsister. Why does it do that? I'm sorry, Judge? Why does it do that, depriving him the right to live with his mother? Well, Your Honor, when the family is seeking to relocate to the state of Colorado and Mr. Cornell is already there working in this job, it either deprives them the opportunity to live together in Colorado with the stepsister, stepfather, and the mother who's been the most active in this child's life, or it forces Mr. Cornell to lose a well-paying job, come back to central Illinois, move in with the maternal grandparents who already have six people living there. I understand, Counsel. I'm very sympathetic to that. But it doesn't... the court's order doesn't necessarily result in Mom not even still living with the child. Well, Judge... In fact, the court could have said, you know, this is a very close case, but the best interest of this child is to simply maintain the status quo. Isn't that possible? And if so, how can we say the opposite conclusion is clearly apparent? Well, Your Honor, I believe that you must say that the opposite conclusion is clearly apparent when looking at the statutory factors which our legislature has laid out. Yes, Mr. Cornell can move back here, but that's still not the status quo. He's coming back without a job. They're coming back without a house. And that's placing... yes, they have the... Mr. Bishop? I meant the status quo with regard to the time the child spends with each of the parents. And the status quo with regard to the schedule that the child's become accustomed to, and where the child lives, and the school where the child attends, and those kinds of things. And, Your Honor, I again would just assert that when you look at the statutory factors, in fact, under the proposal that Ms. Bishop raised, Mr. Lipshear ends up with even more parenting time. So it's a question of should we make her stay separated from her spouse, or stay in Illinois where for the last several months now she has only been with the one child? Should we make them come back to Illinois, or do we look to the quality of Mr. Lipshear's parenting time and whether, as a factor, and whether the quality of his parenting time is going to be adversely affected by allowing this removal, relocation. And I assert that the evidence demonstrates, again, in fact, he's going to end up with more parenting time. Well, that would be the quantity, but as to quality, is that what the trial court found? As to quality? Yes. The court really, all the court noted, Your Honor, was it was concerned about the visitation schedule. So does that mean that the court was concerned about quality? The court also said that Mr. Lipshear's position shouldn't be any greater or less of a factor or impact than should Ms. Bishop's and her husband's. And that's true. But I think the evidence demonstrates, and the comments by the trial court demonstrate that the court was focusing on Mr. Lipshear no matter what. That it was the court's concern about his visitation, not the child's impact. The impact on Mr. Lipshear. But, again, Your Honor, I submit when you look to the factors and when you look to the extensive amount of parenting time which was proposed for Mr. Lipshear, again, he ends up with more time than he had. This court has many times, as has the Supreme Court, found that having concentrated time certainly doesn't necessarily adversely affect the relationship. There was testimony in this case by Ms. Bishop, in fact, that perhaps it would be better. Because when the child is only there for the few days out of the month, then he comes back. And because different disciplinary practices are used by Mr. Lipshear versus her, it's kind of more confusing for the child. So if it's more concentrated time, that would be more of a positive impact on the child. Finally, Judge, with regard to even the child's wishes, yes, we have a young child here. But we had a guardian ad litem who interviewed the parties, who observed the parties and the child and spoke to the child, who clearly has a close, close relationship with his stepsister, Mavis. It's half-sister. I'm sorry. I'm sorry. Half-sister. I apologize. Half-sister, Mavis. And he, too, had recommended that it was in the child's best interest that this relocation go forward. Whereas Mr. Lipshear's other son, 8-year-old son, had no relationship with Ms. Bishop's child. And so, in the end, your honors, I believe the evidence clearly demonstrates the court's ruling was against the manifest way of the evidence. And we ask the court to reverse and allow the relocation of this family. Thank you. Thank you, counsel. Mr. Crotch, you may come forward. Thank you, Justice. Counsel, may it please the court. I hadn't planned on starting this way, but I think I need to address some of the questions and some of the responses you received from counsel. First of all, I want to distinguish between what the court ordered in this case as to parenting time. Prior court, by agreement, which was two weekends a month throughout the year in the holiday parenting time. Ms. Bishop testified, as did Mr. Lipshear, they didn't follow the schedule. Mr. Lipshear got at least half the summer. Ms. Bishop testified at one point that sometimes in the summer he got up to a month at a time with the child, by agreement. With regard to Mr. Cornell's health conditions, you know, the question was, I don't remember if this was Judge Jarman's question or if it was phrased this way by counsel, why would the judge hold this way? Why would the judge not take these into account, these health conditions? Well, first of all, Mr. Cornell said he had these health conditions. Never saw a doctor. Never, never complained about it. He's a welder. I understand. It's dirty work. I get it. But he was also a smoker at the same time. Never saw a doctor about it. Never raised the issue with a health care person. Also, remember, when we discussed and we had testimony on Mr. Cornell's termination with Trinity, we found out the day of trial, he didn't walk away from Trinity. He was fired for progressive discipline. And there were disciplinary records showing for months he was late for work and not on work on time. And this was coming for a while. But we had explanation of that from the supervisor. I mean, would you agree it's pretty rare for a supervisor of someone who was fired to come in and testify on their behalf and corroborate what they said about the conditions and explain that although these warnings said final notice, that's not what it really meant and here's how it works. I mean, that was not credible? Absolutely fair. Absolutely fair that a supervisor came in and said that. So you're telling me, though, if that question, if the story in that question is what we have to believe, then you're an employee at a workplace and you get two, three warnings that say final notice. This is it. This is your last chance. They don't mean anything. Supervisor, they don't mean anything. That's the way. Well, the thing is, counsel, at the hearing, at the testimony that we heard, was that had he not taken that day off that he had previously been allowed to take or told he was going to be allowed to take, that he would still have the job. Absolutely. This seems to suggest that this policy of this is your final warning, it's like the worst thing you can do as a parent, be inconsistent, not follow through. It sounds like that kind of policy. Absolutely fair. But in Eckert, just like in Eckert, he could have had this job. He did not have to quit this job at Trinity. I understand what you're saying. This wasn't a factor for the trial court either, was it? No, but the idea, when you asked how could the judge have been, and I believe, I don't mean to misrepresent your question, but how could the judge have disregarded this health issue? Well, my gosh, as we got deeper into the Trinity story, it got more and more discombobulated and we're doing discovery, essentially, at the trial. We hadn't been told that there was a finding in unemployment for this. We got it introduced at the next hearing at trial. But I didn't get the impression that the judge considered any of this as a negative against. No, but what the judge said, and let's be fair to the judge. The judge's decision on this case, after three and a half days of testimony, written arguments and oral arguments, he had a transcript of his decision. It's 40 pages where he went through each and every factor. And remember, the 609.2 factors, there's no single factor that every case is different, and we look at all the different factors. He hit every single one of them. We can disagree. Ms. Bishop can disagree. Each one of you can disagree with this factor or another factor. But is it clearly wrong? Is it clearly wrong? And this is what he said about the relocation. In weighing all the evidence, I think the circumstances and the reason for the intended relocation certainly are not, there is no evil intent. But I can't overly find that the job itself that Ms. Bishop's new husband has found is so overwhelmingly better than the old job, or if it was only, if it was the only job available, such that it should be the main reason for relocation necessarily. Is that the standard, that you have to show that it's overwhelmingly better? No, but in this case, we have a job where, remember, they have an actual pleading on file that says he's getting a job in Colorado, that's a better job. Well, it doesn't pay as much. 20 cents less. 20 cents less, but not as much overtime. Do you disagree that he was already being groomed for a foreman's position? He had no opportunity for that where he was. He testified to that. I don't know. Was there evidence to the contrary? No, no. No, that's fair. That's fair. His opportunities for advancement were better? He testified to that, correct. Okay. And then the insurance issues and the 401K? He testified. I don't dispute. I don't dispute there are things about the Destiny's job that are better than the Trinity job. I don't dispute that at all. But the question was, why could the judge overlook that? The judge could overlook that because the testimony about the Trinity job and how he left the Trinity job was a mess. Well, you've referenced the statutory factors, and, of course, that's what we're guided by. I have a couple of questions about comments made by the trial court. When the trial court concluded that relocation would not have a significant impact, well, that it would have a significant impact in that it would change respondents' relationship with the child, is that a proper consideration? Well, it's a proper consideration. I wouldn't have phrased it that way. I guess, you know, it's always going to change. Absolutely. That's exactly what I was just going to say. So that's my concern about that. I think what the judge was saying was we have a child here who was enrolled by the mother in preschool. Okay? And one of the reasons he was enrolled in preschool was because he had socialization issues. His socialization issues were severe enough that she considered an autism spectrum test. She did not make him attend preschool. The father reached out to the school to find out about attendance and learned that he wasn't attending a mom with a Druin. So the judge saying that there's going to be a change, I mean, I think that... Well, change respondents' relationship with the child. I understand your point. Is that a proper consideration? It's a proper consideration. I wouldn't have phrased it that way. I agree with you. The child's relationship, the father-child relationship is going to change in this case. I agree with you. But the idea that... The court referenced that this move might be better for the family and might have some positive impact on ML. I'm just wondering, did the trial court hold the mom to some standard that's not articulated in the statute? I mean, I'm not really sure. Okay. Let me jump to that. Okay? We have a... I don't answer your questions now. I don't believe the judge held the mom to a different standard than he did the father. Let me tell you why. That wasn't quite my question. Okay. I'm sorry. What was your question? Did the trial court hold the mom to a standard different than what the statute requires? Absolutely. The opposing counsel gets up and says, if relocation isn't awarded in this case, then it can never be awarded. So I'm just... A completely overly dramatic comment. I mean, certainly there are cases where there's a significant job benefit or where a parent is not exercising their parenting time. Certainly, I mean, most of the relocations that are granted are distinguishable from this case. By far. That is an overly dramatic statement. It's not true. But let me get back to your question about the standard the trial judge held the mother to. And remember, this decision was... I mean, this wasn't a flippant decision. He went through the factors. And one of the reasons you're quoting from it is because he's speaking from the bench. Is it as measured as if he would have sat down and wrote it out? No. He's commenting. He's telling us his reaction to what he's heard, what he's heard in argument, what he remembers from the testimony. Okay? But he does have a petition in front of him. And the mother's petition alleges nine reasons for this relocation to be granted. Of those nine reasons, five of them were not proven at trial. Two of them are irrelevant to the trial court proceedings. And two were the judge found to be, I don't know. I don't know which way to go. And it's the mother's burden to prove relocation is in the best interest of the child by a preponderance of the evidence. She lists nine things. Five of them are not true. Okay? Remember that the mother had the burden at the trial court to prove by a preponderance of the evidence that relocation was in the child's best interest. Your duty is to find out whether or not the trial court's decision was clearly against the manifest weight of the evidence. Counsel, that standard definitely helps you because this is an exceedingly close case. But how about the GAL concluding the relocation was in ML's best interest and in the family's best interest, subject to extensive blocks of parenting time? I know that the judge has the final decision, not the GAL. But in this case, why shouldn't we give significant consideration to the GAL's recommendation? The GAL's temporary report and his final report were both full of errors. Errors. Actual errors of where the uncle lived in Colorado, how often they had seen him, how long he'd been in Colorado. He did not know at the temporary relief hearing that the father had at least half the summers with the child. He did not know that the mother and the father cooperated and let the father have extended parenting time. He didn't know whether the Trinity job was a union job or the Vestas job was a union job. He said at that, and this would play into the questions earlier, he thought the benefits were about the same at the Vestas and the Trinity job. Between this, I think he met with the child and the parents in September of 2017, and through the trial date and the oral argument, never met with the child again, never met with the parents again, sat in a court. His report was full of errors. He focused on things that were not 609.2 factors. He focused on things like demeanor, what he felt. I think he focused on the issue of father's complicated relationship with his older child, which to answer your question, Justice, should not have been considered. Should not have been considered. It's a different factor. What the factor is in 609.2 is, we always forget this when people talk about somebody's getting more days than they had under the old plan. The factor is this, the history and quality of each parent's relationship with the child. And specifically, whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment. There is no question from anybody, every witness who was asked, that the father had far more parenting time in this case than he was ordered to have. It's not about counting days. It's not just about a quantitative difference. And I agree that the judge, in this case, looked more at the qualitative difference than the quantitative difference, even though he didn't use those words. Those are the, that's the statutory language. It's not, hey, can we give him more time, which I disagree with, that he would get more time under their parenting plan or their proposed plan if reallocation was granted. That's not it, does he get more days. That's not the issue. Tishner says in her brief that Mr. Lebsher has not exercised parenting time with ML during his work week in the past three years. She also says that he had every other week in the summer and sometimes would have up to a month at a time. So those two things can't be true. Remember also, and I didn't hit this earlier when we were talking about the petition. In her petition, and she testified, that for the first 18 to 24 months of the child's life, Mr. Lebsher wasn't involved in the life of the child. And then we introduced evidence showing pictures, date-stamped pictures from that entire period that shows he was completely involved in the child's life. In fact, the pleading was more definitive than I think I just said. The pleading said the father had no relationship with the minor child for the first 18 to 24 months of the child's life. Absolutely, this isn't an opinion, factually untrue. And the judge heard evidence like this. The judge heard evidence about this. The judge heard evidence about what happened with leaving the job at Trinity. And he went through the petition, as we went through the petition. These things were not proven. These items were not proven. Did the court make these credibility determinations in its ultimate ruling? Did not make, did not say anything about credibility, but he did contradict the statements in the petition, whether there is no dispute that this father had a great relationship with the child, had a strong relationship. There was no dispute. So he didn't say, well, now or at the time in question that they were talking about. It was different. The court may have found that at this point in time, at the time of the hearing, he did. That's what the GAL found in the original report. But it wasn't true because he had only listened to the mother. He hadn't done the investigation. The father, and this wasn't like a couple of pictures over 18 or 24 months. This was a stack of pictures throughout that entire time that it was alleged that my client had no contact, no relationship with the child. Absolutely untrue. When looking at the 609.2 factors, so we can set the... So I get back to my question. Did he exercise parenting time during the work week or was his parenting time normally on the weekend? Absolutely, absolutely. During the summer, he would have the child for a week, week to week essentially. And again, according to the mother and him, up to a month at a time in some cases. So that would encompass during the work week. So on the 609.2 factors, we'll put the petition away for a second. Remember that none of the factors, and I know we spend a lot of time talking about Trinity and Vestas and Mr. Cornell's jobs. No factor should weigh more than any other factor and each case is different. We have to look at all the different factors. The court definitely weighed the factors here. This is not a petition for relocation denied decision. He goes through and speaks from memory on some of the issues. And there's no question on the 609.2 factors that the father had a strong relationship with the child. And he substantially exercised far more parenting time and parental responsibilities than were allowed under the parenting plan. When we talk about the anticipated impact on the relocation of the child, remember the court... I sense from a previous question that they thought the court was waffling where the judge said he didn't know. But we had Amy Lehrer, the child's preschool teacher, talk about the social delays the child had. The reason the child was in preschool was to work on the social delays. Then the child wasn't forced to go to preschool and was ultimately withdrawn or asked to leave. It was kind of unclear which it was. The judge wasn't sure how this was going to impact this child. This child didn't know. And remember, under the case law, it's Ms. Bishop's responsibility to prove that relocation is in the best interest of the child by a preponderance of the evidence. Also remember, we had, I believe, 10 or 11 witnesses. We had maternal... When we talk about family members in Colorado and in Illinois, we have a maternal uncle, his wife, and children in Colorado who would be two and a half hours away from where Ms. Bishop intends to relocate. In Illinois, in the child's life, testimony from these people in the child's life, both maternal grandparents... The maternal step-grandparents are also in central Illinois, have a very close relationship with the child. The paternal grandparents are in central Illinois. The paternal aunt and cousin, with whom the child has a close relationship, are in central Illinois. The father's fiancé, who is extremely close. The father's fiancé's parents, are they in-laws yet? Not in-laws yet, but very close to the child. See the child every time. The father sees them, so twice a month. And then the father's fiancé's sister, Avery, who's like the little boy's best friend. These are all the people in central Illinois. There's testimony that in two years, for the maternal grandparents, people may move to Colorado. Awesome. That's great. In 10 years, the step-maternal grandparents would move to Colorado. Again, awesome, great. But that's not where they are now, and that's not what the statute asks you to look at. The statute asks you, where are people right now? Where are the people? We've got two in Colorado, and 102 in central Illinois. And the judge took that into account. One other thing I wanted to address, because it was mentioned in the reply brief. In my brief, I was very specific in the statement of facts, where I talked about Mr. Cornell being a boyfriend at the beginning, and a husband after August. It was suggested that was inappropriate for me to say that. I certainly didn't mean it inappropriate. It has no bearing on the case, whether he's a husband or a fiancé. But I was not saying that to make any point, and I certainly meant nothing wrong by it. It's just that at the beginning of the case, when they went to Colorado, he was a boyfriend, and when they filed the petition for relocation, he was a husband. So based upon the petition, and the fact that the petition was just flatly not proven in court, and the fact that the judge painstakingly went through the 602.9 factors, and the fact that the judge's ruling was extensive, I think meticulous, he clearly listened to the evidence, he clearly listened to the arguments, he even parroted back some of the arguments when he delivered his opinion. We understand that the mother would like the trial court, and would like you to find that the trial court could have issued a different ruling. But that's not enough. It's not enough that you would weigh these factors differently. You have to find that the trial judge made a clear, obvious error, and to find it against the manifest weight of the evidence. We do not think that there is enough evidence supporting the mother's argument to suggest that the decision was a clear error, or against the manifest weight of the evidence. And as such, we ask the court to affirm the trial court's ruling. Thank you. Thank you, counsel. Any rebuttal, Ms. McGrath? Your Honor, with regard to the time that Mr. Lipshear had with Madden, yes, Ms. Bishop gave Mr. Lipshear additional time. She tried to work with him, and she will when they move to Colorado, too. That's a sign that this can work. I addressed this in my reply brief. I apologize, as I stand here, I don't have the citation, but it is in my reply brief. At no time was this child with Mr. Lipshear for a month at a time. The testimony is clear. Ms. Bishop testified. In the summer, he may have had the child for a week, and then the rest of the month, that might have been it. So in answer to Justice DeArmond's question earlier, during the summertime, the child would have been with him at a week at a time, at times. There's no evidence that they split the summertime. He did have more time in the summer, but with our proposed parenting schedule in Colorado, he's going to have six weeks in the summer. Now he only has two weeks. Even if you say, yes, he's had some more time in the summer, this is what she had proposed. No, it was six weeks in the summer, time every month with the child, either in Colorado or in Illinois. So, yes, did he get more time? There is no evidence in the record, I submit, that contradicts Ms. Bishop's testimony. From the past three years, Mr. Bishop did not have weekday time other than the summertime. The court itself found that Mr. Lipshear may not have been as active in the child's life for the first 12 to 18 months, but the court was focusing only on the current situation. And I submit the court also erred by not looking at the whole picture, by not looking at the demonstrated evidence or the evidence that established that that's important, that for the first part of this child's life, Mr. Lipshear was not active. And again, only at this point. My comment to you, Justice, is at the beginning that if this case, if relocation was not warranted, and if the court's ruling was not against the manifest way of the evidence, then the only time relocation is going to happen is if an objecting parent has no relationship, is because Mr. Lipshear's relationship with his child is important. We know that. We can see that. But it's no different than any parent who has a regular schedule, who only has four days out of the month, who has summertime, and who alternates holidays. And so if that's enough of a reason to deny relocation, then we wouldn't have reasons for relocation. I see my time is up. You have until the red light comes on. Oh, thank you. With regard to, I agree that the trial court did outline the factors. But again, with all due respect to the trial court, when you read his reasoning, again, as I outlined in my earlier argument, he says things like, I don't know how this is going to impact the child. His whole focus seems to be on Mr. Lipshear and the impact on Mr. Lipshear and not the impact on Madden, which I submit the evidence clearly demonstrated that relocation was in Madden's best interest when looking at all the evidence. With regard to extended family, I think I've covered this. The court itself even found that the extended family from Ms. Bishop's side of the family was closer. Her father was already moving his business out to Colorado, so this wasn't a 10-year plan. The trial court didn't put much weight to that, but yet it put weight to the fact that hopefully or presumably the paternal grandparents would be closer. So you have extended family at both sides. And I think when looking to who was the primary person to care for Madden, what is the current circumstance, and that is she's remarried, she has another child, he found a great job in Colorado. There shouldn't have been any reason to preclude, based on the evidence, it was against the manifest way of the evidence, to not allow them to move to Colorado. You know, nothing would keep Mr. Lipshear from moving to Colorado. Nothing kept Mr. Lipshear from talking in the past about moving to other towns, which certainly would have significantly changed the parenting plan. And I submit, Your Honors, with all due respect, that this ruling was against the manifest way of the evidence. And on behalf of Ms. Bishop, I ask the court to reverse the trial court's ruling. Thank you. Thank you to both of you. Counsel will take this matter under advisement and be in recess at this time.